UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 15-2091 JGB (SPx)** | Date | June 13, 2017 |
|---|---|---|---|
| Title | *Abdul R. Salem v. United States of America, et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**  Order: DENYING Individual Federal Defendants' Motion to Dismiss (Dkt. No. 72) (IN CHAMBERS)

   Before the Court is a Motion to Dismiss filed by Bryan McKenrick, Robert Rector, Zoila Flores, Angel Colmenero, and Jeremy Newbold (collectively, "Defendants" or "Individual Federal Defendants"). ("Motion," Dkt. No. 72.) After considering all papers timely filed in support of and in opposition to the Motion, the Court DENIES Defendants' Motion to Dismiss.

## I. BACKGROUND

**A. Procedural History**

   On October 9, 2015, Abdul R. Salem ("Plaintiff") filed a complaint alleging various constitutional and tort claims against the United States of America, the Los Angeles Fire Department, and Does 1 through 10. (Dkt. No. 10.) On March 18, 2016, the parties filed a stipulation to allow Plaintiff to file a first amended complaint, which he filed on May 2, 2016. (Dkt. Nos. 20, 22-25.) Plaintiff moved to amend his complaint again on November 9, 2016. (Dkt. No. 39.) On December 13, 2016, the Court granted Plaintiff's motion for leave to amend, and Plaintiff filed his Second Amended Complaint on December 15, 2016. (Dkt. Nos. 47, 48.) The parties then stipulated to allow Plaintiff to once again amend his complaint to name the individual defendant officers and agents in their individual capacities. (Dkt. No. 50.) The Court granted the parties' stipulation, and Plaintiff filed his Third Amended Complaint—the operative complaint— on January 4, 2017. ("TAC," Dkt. No. 53.)

   The TAC names City of Los Angeles, Supervisory Customs and Borden Protection Officer ("SCBPO") Bryan McKenrick in his official and individual capacities, as well as Customs and Border Protection Officers ("CBPOs") Robert Rector, Zoila Flores, Angel Colmenero, and

Jeremy Newbold in their individual capacities in addition to the Defendants named in the original complaint. (Id.) The TAC alleges ten causes of action. Specifically, Plaintiff brings three constitutional claims under Bivens, including: (1) unreasonable search and seizure in violation of the Fourth Amendment, (2) excessive force under the Fourth Amendment, and (3) violation of the Fifth Amendment's Equal Protection Clause. Plaintiff brings five claims under the Federal Tort Claims Act, including, (4) assault, (5) battery, (6) false imprisonment, (7) intentional infliction of emotional distress, (8) negligent infliction of emotional distress, and (9) negligence. Plaintiff's tenth cause of action is a substantive due process claim for denial of medical attention under section 1983. (Id.)

On April 21, 2017, the Individual Federal Defendants filed a Rule 12(b)(6) motion to dismiss Plaintiff's First, Second, and Third causes of action. ("Motion," Dkt. No. 72.) Plaintiff filed an Opposition to the Motion on May 15, 2017. ("Opposition," Dkt. No. 76.) On May 22, 2017, Defendants filed their Reply. ("Reply," Dkt. No. 79.)

**B. Factual Allegations and Claims**

The following facts are drawn from Plaintiff's TAC and taken as true for purposes of this Motion. Plaintiff, born in Egypt, has been living in the United States for 40 years and is a naturalized American citizen. (TAC at ¶ 8.) He is 77-years old and has no criminal record. (Id. at ¶ 14.) Plaintiff has a doctorate in philosophy from the University of California, Los Angeles, and, as an accomplished and bilingual playwright, he travels to Egypt once a year to teach at the Academy of Arts in Cairo as an adjunct professor of literature. (Id. at ¶¶ 14, 16.)

On February 21, 2014, Plaintiff was scheduled to fly to Cairo, Egypt on British Airways flight 263 ("BA 263"), departing from Los Angeles International Airport ("LAX") at 8:45 pm. (Id. at ¶ 17.) He arrived at the airport two hours prior to departure, checked his bag with British Airways personnel at approximately 7:15 p.m., and proceeded to the Transportation Security Administration ("TSA") security checkpoint with two carry-on bags. (Id. at ¶ 17.) At approximately 7:30 p.m., Plaintiff presented his boarding pass and United States passport to TSA officials. (Id. at ¶ 18.) Because the Plaintiff's name on Plaintiff's boarding pass did not match the name on his U.S. passport, TSA officials initially prevented him from passing through the security checkpoint. (Id.) The TSA officials let him proceed, however, once he presented his Egyptian passport with his full legal name. (Id.)

Plaintiff arrived at the departure gate at approximately 7:45 p.m. and waited until the flight commenced boarding. (Id. at ¶19.) Once boarding began, Plaintiff allegedly stood in line, provided his boarding pass to gate personnel, and entered the passenger boarding bridge ("bridge") with his two screened carry-on bags. (Id.) As Plaintiff proceeded toward the aircraft, CBPO Flores allegedly waived her hand at him and demanded to inspect his passport. (Id.) Plaintiff alleges that when he asked Flores why he was being singled out when the other passengers were permitted to board the aircraft, she ignored his query. (Id. at ¶ 20.) While Plaintiff attempted to procure his passport and boarding pass, SCBPO McKenrick and CPBO Rector and Colmenero, allegedly intercepted and began yelling that he was a "bad man." (Id.)

Plaintiff describes the three aforementioned officers as follows: one was a heavily built male with dark skin and black hair, the other had fair skin, a light built and blonde hair, and the third officer had a light build and blonde to light blonde hair. (Id. at ¶ 21.)

The CBPOs allegedly accused Plaintiff of attempting to physically strike Flores "despite making no verbal or non-verbal indication that he intended to do so." (Id. at ¶ 22.) Next, the three officers grabbed Plaintiff while he was on the bridge. (Id.) Specifically, Plaintiff alleges two officers tightly grabbed each of his arms, and another officer tightly gripped Plaintiff's neck, while allegedly "exclaim[ing] they had the right to search him." (Id.) Plaintiff maintains that throughout this time he neither attempted to resist the officers nor attempted to flee—he merely asked why he was being treated "like a criminal" and pled with the officers to stop hurting him. (Id. at ¶ 23.) Plaintiff further alleges that no evidence of contraband, weapons or illegal activity was found on Plaintiff's person. (Id.) Plaintiff alleges that he was nevertheless then physically directed to approximately ten feet away from the aircraft in the bridge area and instructed to place his two carry-on bags on a nearby table. (Id. at ¶ 24.) The officers allegedly continued to physically restrain Plaintiff during this search. (Id. at ¶ 25.) When Plaintiff requested yet again to understand why he was being singled out, he was allegedly instructed to remain silent while the officers searched his carry-on bags. (Id. at 24.) The search of Plaintiff's carry-on bags allegedly took 15 to 20 minutes and yielded no evidence of contraband or illegal activity. (Id. at ¶ 26.) In any event, Plaintiff alleges that the officers then told him he would not be boarding his flight that day. (Id. at 25.)

Despite the dearth of any indicia of criminal activity, the officers continued their investigation. At this point, Plaintiff alleges he was forcefully escorted out of the bridge area into two separate interrogation rooms where he was detained, "interrogated, and physically battered and assaulted over the course of several hours." (Id. at ¶ 28.) Plaintiff describes how he has limited flexibility due to his age. (Id. at ¶ 20.) For that reason, when CBPOs Rector, Newbold, and SCBPO McKenrick forcibly bent Plaintiff's back down to a 90-degree angle on a table, he suffered severe pain. (Id.) An officer allegedly "forcibly pushed [Plaintiff's] head against the table," while forcibly pulling Plaintiff's right arm behind his back to place handcuffs on him, which also caused Plaintiff to experience severe physical and emotional distress. (Id.) Plaintiff alleges that when his arm was being forcibly pulled behind his back he cried out in pain and asked the officers to please stop. (Id. at ¶ 31.) The officer allegedly ignored Plaintiff's pleas and continued wrenching Plaintiff's arm. (Id.) At that point, Plaintiff alleges that "a loud sharp crack emanated from his arm," which caused him to scream in pain, nearly faint, and begin to sob. (Id.) Upon hearing Plaintiff's arm crack, an officer allegedly instructed the other officer to use "long handcuffs" to accommodate Plaintiff's lack of flexibility. (Id.)

Throughout this time, Plaintiff maintains that he informed the officers that he was 75-years old, had no criminal record, and had "never been stopped or detained by law enforcement in his life." (Id. at ¶ 32.) Nonetheless, Plaintiff alleges the interrogation continued, and he was taken to a second detention room on a "subterranean floor at LAX," which he believes is a maximum-security room. (Id. at ¶ 33.) In the second detention room, the officers allegedly physically searched Plaintiff's checked luggage, which had been removed from flight BA 263. (Id. at ¶ 34.)

This search revealed nothing. (Id.) At approximately 10:00 p.m., Plaintiff was given his luggage, advised he was free to leave, and that "he had done nothing wrong." (Id. at ¶ 35.) Plaintiff did not leave, however, because the bones in his right arm were allegedly "protruding out of place under his skin," and he needed medical attention. (Id. at ¶ 36.) LAFD sent four paramedics between 10:15 and 10:30 and the paramedics concluded that Plaintiff fractured his right arm. (Id.) Plaintiff alleges that the LAFD paramedics informed the CBPOs that Plaintiff needed further medical attention, but no one offered any medical assistance nor offered to transport him to a nearby hospital. (Id. at ¶ 37.) Plaintiff alleges he was not released from custody until 1:00 a.m. and his cell phone was never returned. (Id. at ¶ 38.)

On those bases, Plaintiff brings the following causes of action against the Individual Federal Defendants: (1) a Bivens claim for unreasonable search, seizure, false arrest, and false imprisonment under the Fourth Amendment against SCBPO McKenrick, and CBPOs Rector, Newbold, and Colmenero (FAC ¶¶ 45-47); (2) a Bivens claim for excessive force under the Fourth Amendment against SCBPO McKenrick and CBPOs Rector, Newbold, and Colmenero (Id. at ¶¶ 48-51); and (3) a Bivens claim for national origin discrimination in violation of the Fifth Amendment's Equal Protection Clause against SCBPO McKenrick and CBPOs Flores, Rector and Colmenero. (Id. at ¶¶ 52-57.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 545.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line

between possibility and plausibility of 'entitlement to relief.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing the party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III. DISCUSSION

### A. Sufficiency of Allegations

The Individual Federal Defendants argue that the TAC must be dismissed because it contains "only conclusory allegations" that fail to state a plausible claim against any one of them. (Mot. at 11.) Each of Defendants' specific arguments are addressed below.

#### 1. First Cause of Action: Unreasonable Search and Seizure and False Arrest

The Individual Federal Defendants argue that Plaintiff's unreasonable search and seizure claim is "barred as a matter of law by the 'border exception' doctrine" to the Fourth Amendment. (Mot. at 12.) Specifically, Defendants maintain that the search of Plaintiff and his baggage "cannot constitute the basis of a Bivens claim" because under the border exception doctrine, the CBPOs could detain and search Plaintiff without probable cause or even reasonable suspicion that Plaintiff had engaged in illegal activity. (Id.) As to the reasonableness of the alleged search and seizure, Defendants argue that "delays of one to two hours at international borders are to be expected," and thus, do not state a cognizable Fourth Amendment claim as a matter of law. (Reply at 4-5.)

Plaintiff, on the other hand, argues that notwithstanding the diminished Fourth Amendment protections one enjoys at international borders, the unreasonableness of the CBPOs search is adequately alleged because the "search and the subsequent seizure of Plaintiff's person and belongings were. . . excessively intrusive, conducted unreasonably and aggressively, and motivated by Plaintiff's ethnicity and national origin." (Opp'n at 14.) Based on the allegations, the Court agrees.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The Fourth Amendment limits government action in two ways: (1) searches and seizures must be reasonable, and (2) when a warrant is required, it must have

certain characteristics. See California v. Acevedo, 500 U.S. 565, 581 (1991) (Scalia, J., concurring). Applying these limitations, the Fourth Amendment requires that all searches and seizures be supported by a warrant when people have a reasonable expectation of privacy in their persons or effects, unless they fall into one of the exceptions to that requirement. See Minnesota v. Dickerson, 508 U.S. 366, 372-73 (1993).

    The border search doctrine is a narrow exception to the Fourth Amendment's usual requirement that searches be supported by a warrant issued upon a showing of probable cause. United States v. Sutter, 340 F.3d 1022, 1025 (9th Cir. 2003). Border searches are grounded on the government's right to protect the territorial integrity of the United States by examining persons and property entering and leaving the country, and "are reasonable simply by virtue of the fact that they occur at the border." United States v. Flores-Montano, 541 U.S. 149, 152-53 (2004)(quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)). As a result, most searches at the international border need not be justified by a search warrant or by individualized suspicion. See Sutter, 340 F.3d at 1025. The border search doctrine applies equally to searches of persons and property exiting the United States as to those entering the country. See United States v. Cardona, 769 F.2d 625, 629 (9th Cir. 1985)(observing that "the border search exception applies to exit searches"). Relatedly, the "functional equivalent" doctrine effectively extends the border search doctrine to all ports of entry, including airports. See Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973). A routine customs search at the "functional equivalent" of the border is "analyzed as a border search" and therefore requires neither probable cause nor reasonable suspicion. See United States v. Seljan, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). That said, this does not mean that at the border "anything goes." United States v. Cotterman, 709 F.3d 952, 960 (9th Cir. 2013)(citing United States v. Seljan, 547 F.3d 993, 999 (9th Cir. 2008)); United States v. Duncan, 693 F.2d 971, 977 (9th Cir. 1982).

    Generally, the law provides that when Customs Officers first encounter an individual at an international border, like LAX, the officer has discretion to stop the person and conduct a preliminary border search without fear of running afoul of the Constitution. Ramsey, 431 U.S. at 619. Included within the officer's discretion is an entitlement to conduct routine questioning, Kaniff v. United States, 351 F.3d 780, 784 (7th Cir. 2003), examine the entrant's luggage, and conduct Terry patdowns and frisks, United States v. Vega–Barvo, 729 F.2d 1341, 1345 (11th Cir. 1984); see also Bradley v. United States, 299 F.3d 197, 203–04 (3d Cir. 2002); United States v. Beras, 183 F.3d 22, 25–26 (1st Cir. 1999); United States v. Vargas, 854 F.2d 1132, 1134 (9th Cir. 1988); United States v. Carreon, 872 F.2d 1436, 1442 (10th Cir. 1989); United States v. Oyekan, 786 F.2d 832, 835 (8th Cir. 1986).

    The Supreme Court has also recognized a category of searches deemed "extended border searches," which are typically separated from the border by "a greater spatial and temporal distance." United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007). Because "the delayed nature of an extended border search. . . necessarily entails a greater level of intrusion on legitimate expectations of privacy than an ordinary border search," the government must justify an extended border search with reasonable suspicion that the search may uncover contraband or

evidence of criminal activity. See United States v. Caicedo-Guarnizo, 723 F.2d 1420, 1422 (9th Cir. 1984).

An administrative search is another exception to the Fourth Amendment's general requirement that searches be conducted pursuant to particularized suspicion. Airport screening searches have been found constitutionally reasonable administrative searches because they are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings." United States v. Aukai, 497 F.3d 955, 960 (9th Cir. 2007). Here, it does not appear that Defendants argue that the alleged search and detention constituted an administrative search. Had this argument been made, it would surely fail since the search alleged here was neither routine nor minimally invasive. The Court therefore first determines what type of search is alleged to have occurred and then assesses whether the Individual Federal Defendants' conduct, as alleged, exceeded what is constitutionally permitted under the Fourth Amendment.

### a. The Alleged Search Was Not a Routine Border Search

The first step in the Fourth Amendment analysis is to determine whether a search or seizure has taken place. United States v. Davis, 482 F.2d 893, 904 (9th Cir. 1973). Taking all of the allegations in the TAC as true, Plaintiff was undoubtedly seized by SCBPO McKenrick and the CBPOs because a reasonable person would have believed that he was not free to leave in view of all of the surrounding circumstances. United States v. $25,000 U.S. Currency, 853 F.2d 1501, 1504 (9th Cir. 1988). Defendants concede that Plaintiff was searched and detained, yet they argue that "the detentions and searches Plaintiff alleges were 'routine' in the border context and thus did not violate the Fourth Amendment." (Reply at 5.) As discussed, the relaxed Fourth Amendment protections at an international border, like LAX, permit Customs Officers to briefly detain individuals and conduct preliminary border searches that are both routine and minimally invasive. As such, CBPO Flores could stop Plaintiff and request to see his identification absent particularized suspicion without running afoul the Fourth Amendment. See Gilmore v. Gonzales, 435 F.3d 1125, 1137–38 (9th Cir. 2006)("The request for identification, however, does not implicate the Fourth Amendment.") (citing INS v. Delgado, 466 U.S. 210, 216 (1984)( "[A] request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.")). However, what allegedly happened next was neither "routine" nor "minimally invasive" and the Court is persuaded that Defendants' alleged conduct plausibly exceeded the bounds of reasonableness under the Fourth Amendment.

Almost immediately after Flores requested to see Plaintiff's passport, he was allegedly forcefully restrained by SCBPO McKenrick and CBPOs Rector and Colmenero in the boarding bridge. Thus, the search alleged here differs in material respects from the suspicionless searches found constitutionally permissible under the border exception doctrine. See United States v. Moore, 483 F.2d 1361 (9th Cir. 1973) (citing Adams v. Williams, 407 U.S. 143, 146 (1872) (stating that customs agents may stop an individual briefly "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."). Unlike a routine airport screening to which passengers are subjected indiscriminately, to which no stigma is

attached, Plaintiff was allegedly singled out from the other passengers on the boarding bridge by CBPO Flores. (TAC ¶ 19.) Since the alleged search was personal in nature, it effects a more substantial invasion of privacy than a routine airport screening. Contra United States v. Davis, 482 F.2d 893, 904 (9th Cir. 1973) (upholding warrantless airport security checks of all passengers and their carry-on luggage as administrative searches because these searches "are neither personal in nature nor aimed at the discovery of evidence of crime, [and therefore] involve a relatively limited invasion of. . .privacy.") (citing Camara v. Municipal Court, 387 U.S. 523 (1967)).

Indeed, while airport security agents may briefly detain a traveler for purposes of completing a security search, the government's discretion to carry out suspicionless investigatory detentions of Plaintiff's person under either the border or administrative search exceptions had been exhausted once Plaintiff cleared the TSA security checkpoint. See United States v. McCarty, 648 F.3d 820, 836 (9th Cir. 2011) ("Once Andrade was sufficiently certain that there were no explosives or other safety hazards hidden inside McCarty's bag, the administrative search was over."). "[W]here an action is taken that cannot serve the administrative purpose—either because the threat necessitating the administrative search has been dismissed, or because the action is simply unrelated to the administrative goal—the action clearly exceeds the scope of the permissible search." McCarty, 648 F.3d at 835. Once Plaintiff was forcefully restrained, separated from the other passengers by three CBPOs who grabbed both of his arms and his neck, and told he was not free to leave, Defendants' conduct exceeded the bounds of a routine preliminary border screening that may be justified by the sovereign's interest in protecting its territorial integrity or the exigencies of the passenger safety at the airport. United States v. $124,570 U.S. Currency, 873 F.2d 1240, 1245 (9th Cir.1989) (noting that, unlike this case, "the court cannot sustain a subsequent search that differs in material respects from the search initially approved"). This, of course, assumes Plaintiff did not attempt to strike Flores, which would have provided the Officers additional justification to detain Plaintiff.

As alleged, the search was neither random nor limited. Nor was it confined in its intrusiveness and in its attempt to discover weapons and explosives. Here, upon placing Plaintiff's bags through the TSA Security Checkpoint and providing his boarding pass and proper identification, the TSA officials let him proceed. As such, what Plaintiff alleges occurred here differs substantially from the FAA procedures upheld as reasonable at airports to prevent hijackings under the Fourth Amendment. For example, in cases upholding reliance on the Federal Aviation Administration's "hijacker profile" (the "Profile") to conduct a nonroutine search of airline passengers, the passenger had only been singled out, moved away from the boarding area, and subjected to a nonroutine search of his person and bags once the passenger: (a)

conformed to the Profile,[1] and (b) the magnetometer registered a positive reading.[2] First, "[i]f a passenger conforms to the Profile, airline personnel then alert either other employees or available U. S. marshals stationed at the boarding gate to observe the passenger carefully as he proceeds to board." United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972). Id. at 1182 (3d Cir. 1972). The case law describes the permissible scope of a nonroutine search as follows:

> If the noted reading is neutral the particular passenger boards without further inquiry or surveillance. On the other hand, if a positive reading is noted the particular passenger is requested to pause for questioning. Basically, the questioning is limited to identification and short inquiries concerning what in the passenger's possession might have triggered the magnetometer. According to recommended procedures the passenger should be asked to divest himself temporarily of anything metallic and again move through the magnetometer. Only if he registers a second positive reading should he still not be permitted to board. Instead, he should be escorted beyond the boarding area and frisked for weapons or explosives. If none are found a request then should be made to search the passenger's hand luggage. The passenger should be arrested if the frisk or search discloses a weapon, explosives or contraband. Otherwise, he should be permitted to board.

Id.; see also United States v. Valenzuela, 899 F.2d 19 (9th Cir. 1990) (finding search of luggage more intrusive than necessary where upon X-raying the bags and discovering suspicious items the airline personnel searched the luggage without first asking for consent, summoning law enforcement personnel or asking for photo identification and observing that failure to "pursue any of these avenues of conduct. . .render[ed] her search unconstitutional).

---

[1] United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972) ("The Profile was developed by a group of professionals representing a cross-section of the various fields of expertise relevant to the hijacking problem. In its entirety the Profile establishes approximately twenty-five characteristics which studies have shown to be held in common by past hijackers. Several of these characteristics, all of which are readily discernible, are used by the airline personnel to screen passengers preliminarily.")

[2] United States v. Miner, 484 F.2d 1075, 1076 (9th Cir. 1973)(remanding because record on appeal was inadequate for determination of whether airport search was lawful where passenger "was in a hurry, seemed nervous, and was determined by one of the ticket agents on duty to fit the Federal Aviation Administration's 'profile' of possible airline highjackers," the magnetometer failed to register, and when asked to open his suitcase the passenger refused); see also  United States v. Aukai, 497 F.3d 955, 962 (9th Cir. 2007) (upholding the search procedure because it was only after the standard wanding procedure disclosed an item in the passenger's pocket, the passenger denied he had anything in his pocket when the TSA agent asked, and the TSA agent repeated the wanding procedure and the alarm sounded again that the agent "employ[ed] a more intrusive search procedure by feeling the outside of Aukai's pocket and determining that there was something in there.").

Based on the allegations, the search procedures were not well-tailored to protect Plaintiff's personal privacy, particularly where the foregoing screening failed to disclose a reason to conduct a more probing search. Accord United States v. Hartwell, 463 F.3d 174, 180 (3d Cir. 2006). Even the case cited by Defendants affirms that suspicionless border searches are only permissible if they are not personally intrusive, do not significantly harm the objects scrutinized, and do not unduly delay transit. United States v. Okafor, 285 F.3d 842, 846 (9th Cir. 2002); see also United States v. Marquez, 410 F.3d 612 (9th Cir. 2005)(holding that scanning the passenger's person with a handheld magnetometer was reasonable given that the passenger had ample opportunity to forego travel to avoid the screening, was chosen at random, it was a limited search that was confined in its intrusiveness and in its attempt to discover weapons and explosives, and there was no indicia of an improper motive). In another case, the passenger was only singled out and asked to remove his sweater and undershirt after an initial pat-down search revealed excess currency than could be exported without a declaration. United States v. Duncan, 693 F.2d 971, 978 (9th Cir. 1982). The Ninth Circuit held that the manner in which the search was conducted was reasonable because "although the stop eventually stretched to over three hours, most of this time was after agents had evidence Duncan had violated the law, and thus had cause to detain him." Id. It also concluded that there was no "serious invasion of personal privacy and dignity," because it "was conducted out of the public view, initially on a deserted boarding ramp and later in a room, thus ensuring that Duncan would not be embarrassed by the stop and search." Id. Lastly, the Court did not find the search unreasonable because Duncan was the only passenger stopped since "Duncan [did] not argue that he was singled out for impermissible reasons." Id.

Here, on the other hand, Plaintiff alleges he was yelled at in front of passengers on a crowded boarding bridge, physically restrained before he had the chance to explain the discrepancies between the name on his boarding pass and his U.S. passport, and physically searched by three officers despite cooperating with the officers' requests and in the absence of any evidence suggesting the presence of incendiary devices or bombs. See United States v. Ortiz, 714 F. Supp. 1569, 1575 (C.D. Cal. 1989) (holding search beyond "limited detention of passengers and their carry-on luggage in order to resolve suspicious behavior," unreasonable because "match[ing] several characteristics in the 'hijacker profile' does not automatically constitute reasonable suspicion" and "the intrusiveness of the search was quite substantial considering the other alternatives" available). Further, unlike Duncan, the Court finds the TAC plausibly alleges Plaintiff was singled out for an impermissible purpose, as will be discussed in further detail below.

Concluding that the alleged search and detention of plaintiff went beyond a routine airport screening, it could only satisfy the Fourth amendment if conducted based on individualized suspicion and it was reasonable under the totality of the circumstances. United States v. Montoya de Hernandez, 473 U.S. 531, 541 (1985) ("We hold that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal."). In arguing that the "border exception" categorically forecloses Plaintiff's unreasonable search and seizure claim, Defendants effectively concede they lacked reasonable suspicion or probable cause.

In any event, the Court finds the allegations sufficient to plausibly infer that Defendants lacked reasonable suspicion that Plaintiff placed the other passengers at risk.

A temporary detention or seizure is justifiable under the fourth amendment only if "there is articulable suspicion that a person has committed or is about to commit a crime." United States v. Woods, 720 F.2d 1022, 1026 (9th Cir. 1983) (quoting Royer, 460 U.S. at 498). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The assessment is made in light of "the totality of the circumstances." Id. at 417. The alleged search and detention of Plaintiff cannot be justified as a permissible "stop-and-frisk" within the limits of Terry v. Ohio, 392 U.S. 1 (1968). Nor can the alleged seizure be justified as a reasonable investigatory detention since the TAC plausibly alleges Plaintiff was detained and searched without any evidence that Plaintiff posed any danger to passengers or was engaged in any criminal activity.

As the Supreme Court has stated, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive" as to qualify as a mere Terry stop. United States v. Place, 462 U.S. 696, 709 (1983); Id. ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented in this case."). Other than Plaintiff raising his voice in the boarding bridge, the TAC alleges he was entirely cooperative with McKenrick, Rector, and Colmenero's investigation. Even if the initial 15-minute search of his carry-on bags was reasonable under the Fourth Amendment's relaxed standard for airport screenings, this initial search failed to disclose any reason to conduct a more probing search. The alleged length of Plaintiff's detention was not reasonable given that no evidence of illegal activity was found after: (1) his carry-on bags were screened at the TSA checkpoint, (2) his carry-on bags were searched on the bridge; (3) his carry-on bags were searched again; and (4) his checked luggage was searched in the interrogation room. Plaintiff's alleged detention extended beyond the time reasonably required to rule out the presence of weapons or explosives. See Illinois v. Caballes, 543 U.S. 405, 407 (2005) (stating that a seizure can become unlawful if it is "prolonged beyond the time reasonably required to complete [its] mission").

Plaintiff alleges that throughout the detention he "repeatedly stated that he was a 75-year-old man and that he had done nothing illegal," and "had never been stopped or detained by law enforcement in his life." (TAC ¶ 32.) While Defendants argue that their actions were justified because "Plaintiff was travelling with two passports that reflected different names" and "had previously been stopped because his passport did not match his boarding pass," (Reply at 6), there is no reason why Defendants could not verify this information before handcuffing Plaintiff and taking him into two separate interrogation rooms.

Further, the cases condoning extended detentions at airports are distinguishable from what is alleged here. For one thing, in those cases, the law enforcement officers had particularized and objective bases to suspect that an individual was a drug smuggler. The duration of those detentions were found reasonable because the suspected smuggler was detained for no longer

than the time it would take to dispel the officers' suspicions: to monitor bowel movements, conduct a pelvic exam at the hospital, or naturally expel the contraband from their alimentary canals.  See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985); United States v. Gonzalez-Rincon, 36 F.3d 859, 863 (9th Cir. 1994).

In sum, considering the allegations regarding the degree of force exhibited in the boarding bridge, the transportation of Plaintiff to two separate interrogation rooms, and the duration of his detention, the Individual Federal Defendants' position that the alleged search and seizure is reasonable as a matter of law under the border exception is untenable.  Here, the search and detention, as alleged, exceeded what the Fourth Amendment reasonably permits.  Accordingly, the CBPOs could only detain and search Plaintiff after CBPO Flores inspected his boarding pass and passport if they had reasonable suspicion that Plaintiff placed the passengers at risk.  Plaintiff adequately alleges the CBPOs lacked reasonable suspicion to search his carry-on bags.  Further, once the first search of Plaintiff's bags and his person revealed no evidence that he provided false identification or was carrying weapons or explosives, the CBPOs could not detain him further absent probable cause.

### b. The Alleged Unlawful Detention Plausibly Ripened into a De Facto Unlawful Arrest

Now that the Court has determined that the allegations suffice to plausibly infer an unreasonable investigatory detention under Terry, the Court assesses whether Plaintiff adequately alleges he was subjected to a custodial arrest, and if so, at what point.  An arrest without probable cause is violative of rights secured by the Constitution and can be the basis of Bivens recovery.  See Gasho v. United States, 39 F.3d 1420 (1994).  Defendants essentially argue that all detentions and searches are constitutional in the border context.  However, although air travelers accept that their persons and luggage are subject to intrusive searches for security purposes, law enforcement authorities still need probable cause to arrest an individual in an airport.  See Florida v. Royer, 460 U.S. 491, 502-07 (1983) (plurality opinion) (finding officers had reasonable, articulable suspicion to stop defendant because of suspected drug possession but lacked probable cause for an arrest).  Different names on different forms of identification does not contribute materially to an implication of guilt.  See United States v. Moore, 483 F.2d 1361, 1364 (9th Cir. 1973) (holding that a lack of documentary identification containing a physical description, nervousness, confusion, and agitation were insufficient to provide customs agents with probable cause).  Based on the allegations, neither the search of Plaintiff's bags nor any interactions in the boarding bridge yielded any bases on which to suspect Plaintiff of any criminal wrongdoing.  Thus, if the Court finds the TAC adequately alleges a custodial arrest, then Plaintiff will have adequately alleged an unlawful arrest claim under the Fourth Amendment.

There is no "litmus-paper test ... for determining when a seizure exceeds the bounds of an investigative stop."  Royer, 460 U.S. at 506.  In determining whether an investigative detention has ripened into an arrest, courts consider the totality of the circumstances.  United States v. Baron, 860 F.2d 911, 914 (9th Cir. 1988).  The Supreme Court has instructed courts, in assessing the circumstances, to bear in mind that to qualify as a Terry stop, "the investigative methods

employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. The circumstances alleged here go far beyond what could reasonably be considered an investigative detention. As soon as Plaintiff was physically directed away from the other passengers by McKenrick, Rector, and Colmenero by both his arms and his neck and instructed to remain silent, he was silenced and effectively immobilized. Baron, 850 F.2d at 914. At this point, Plaintiff was plausibly placed under de facto arrest without probable cause. Of course, once Plaintiff was physically placed into an interrogation room, he was clearly subjected to a de facto arrest. In Florida v. Royer, the Supreme Court found the fact that the police moved the suspect from an airport concourse to an interrogation room particularly significant in concluding that the investigative detention had ripened into an arrest. 460 U.S. at 504-505. In United States v. Moreno, 742 F.2d 532, 535 (9th Cir. 1984), the Ninth Circuit held that suspects were subjected to a de facto arrest when the police relocated them from the public area of an airport to "a highly detentive environment—... a small room that had been specially designated for police business, alone with several officers who related to them that they were suspected of carrying narcotics."

The police may move a suspect without exceeding the bounds of a Terry stop when it is necessary for safety or security reasons, when it is the least intrusive method to achieve the legitimate goals of the stop, and when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indistinguishable from an arrest. See Royer, 460 U.S. at 504-05. That is not what allegedly happened here. The alleged circumstances surrounding Plaintiff's detention were highly coercive. Plaintiff alleges he was placed in handcuffs by three law enforcement officers who were forcefully wrenching at his limbs and neck at the same time. (TAC at ¶ 30.) Every time Plaintiff asked why he was being detained, McKenrick, Colmenero and Rector ignored his requests and told him to remain silent. (Id. at ¶¶ 24, 27.) What's more, Plaintiff alleges that when he was placed in the interrogation rooms, he was physically battered and assaulted over the course of several hours. (Id. at ¶ 28.) Furthermore, throughout the searches of his luggage, Plaintiff was allegedly threatened with arrest and incarceration. (Id. at ¶ 34.) The Court therefore finds the allegations sufficient to plausibly infer that Plaintiff was effectively arrested by SCBPO McKenrick and CBPOs Rector, Newbold and Colmenero. As discussed, Plaintiff adequately alleges the CBPOs lacked probable cause to arrest him and search his checked luggage.

Accordingly, the Court DENIES the Individual Federal Defendants' Motion to Dismiss Plaintiff's First Cause of Action for unreasonable search and seizure and false arrest under the Fourth Amendment.

### 2. Second Cause of Action: Excessive Use of Force

Defendants repeat their argument that the TAC's failure to specify how each individual CPBO was personally involved in the constitutional deprivation compels dismissal of Plaintiff's second cause of action for excessive force. (Mot. at 13.) Defendants further argue that "the mere fact that an individual suffers an injury is insufficient to state a claim for excessive force."

(Reply at 5.) Additionally, Defendants maintain that their alleged conduct was neither objectively unreasonable nor done with the intent to do Plaintiff harm. (Id. at 14; Reply at 6.)

Specifically, Defendants maintain that grabbing of Plaintiff's arms (TAC ¶ 22), directing him away from the aircraft (TAC ¶ 24), escorting him to the detention room (TAC ¶ 28), bending his back down and putting his head on the table to handcuff him (TAC ¶ 31), and using long handcuffs on him were "reasonable" under the Fourth Amendment because "[i]nherent in the authorization to detain is the authority to use reasonable force to effectuate detention." (Id. at 15.) Defendants further claim that these actions were "minimal intrusions" given Plaintiff's refusal to comply with CBPO Flores' request for his passport and his continued obstinacy and repeated questioning of the officers, and given that the incident occurred "in a crowded jet way full of men, women, and children boarding the international flight." (Id.) Defendants assert that each officer's alleged conduct was objectively reasonable to protect other passengers and help effectuate the CBPOs' search. (Id. at 16.)

Defendants further argue that the TAC "fails to allege facts," showing that each named defendant was personally involved in the deprivation of Plaintiff's constitutional rights. (Mot. at 11.) In Defendants' view, since the allegations that Plaintiff was physically directed away from the aircraft, physically restrained, forcefully escorted to interrogation rooms, and physically battered and assaulted over the course of several hours, (TAC ¶¶ 24-29), do not "specify which officer(s) did these alleged acts," they allege a "team effort," which is insufficient to state a Fourth Amendment Bivens claim against any individual defendant. (Mot. at 11.)

Plaintiff, on the other hand, argues that the TAC concretely alleges McKenrick's, Rector's, Newbold's, and Colmenero's specific acts of misconduct in that they were personally present and engaged in all or part of restraining Plaintiff on the bridge, repeatedly searching through his person and belongings, forcing him into the interrogation room, breaking his arm while handcuffing him or "detaining him for four hours." (Opp'n at 12.)

### a. The TAC Plausibly Alleges Defendants' Use of Force Was Objectively Unreasonable

Fourth Amendment claims of excessive force are analyzed under the "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Under this standard, a plaintiff must allege that officers acted unreasonably in light of the facts and circumstances of the situation they faced, without regard to their underlying motives or subjective intent toward the suspect. Id. at 397. As in the prior section, the court must ask "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them," and balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396. Put differently, the court should "balance the amount of force applied against the need for that force." Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003).

The first factor in determining whether the force used was excessive is the severity of the force applied. Tekle v. United States, 511 F.3d 839, 844 (9th Cir. 2007). Plaintiff was allegedly physically restrained by three male customs officers, forcefully escorted to an interrogation room, physically battered and assaulted over the course of several hours, and handcuffed with such vigor that his arm broke. (TAC ¶¶ 29-31.) The Court concludes that based on the allegations the amount of force used against Plaintiff constituted a "very substantial invasion of [his] personal security." See Robinson v. Solano Cty., 278 F.3d 1007, 1016 (9th Cir. 2002); see, e.g., Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989) ("[T]he officers used excess force on Hansen by unreasonably injuring her wrist and arm as they handcuffed her.").

The second factor is the need for the force. Id. Considerations in determining the need for the force include (1) the severity of the crime at issue, (2) whether the individual poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. In this case, it is not alleged that any of the factors justifying the use of force were present. See Robinson, 278 F.3d at 1014.

All the factors to be considered in determining the need for the force weigh in favor of a finding that the need for force was minimal. First, Plaintiff was clearly an elderly man and as discussed above, was arrested without any probable cause that he had engaged in criminal activity. Cf. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003) (finding the force excessive where the officer threw the plaintiff to the ground and handcuffed her, despite the fact that she posed no safety risk and made no attempt to leave the property). Taking the allegations in the TAC as true, there is no indication that the officers had any reasonable basis to suspect Plaintiff of any crime. There is similarly no indication that Plaintiff posed any threat to passengers' safety. There is no allegation that suggests he was carrying any weapons on his person or had any contraband within his reach. Under these circumstances, it should have been apparent that a 75-year old man standing five-feet-five inches and weighing approximately 175 pounds with no criminal record did not pose a serious threat to any one of the four customs officers present. Washington v. Lambert, 98 F.3d 1181, 1190 (9th Cir. 1996) ("The ratio of officers to suspects present. . . weighs against [Defendants'] using such intrusive action.").

Further, the TAC alleges that Plaintiff was cooperative with Defendants' requests and did not attempt to obstruct the officers' search of his carry-on bags. Wall v. County of Orange, 364 F.3d 1107, 1111–12 (9th Cir. 2004) (reversing the grant of summary judgment where the deputy violently arrested the plaintiff, handcuffing his hands tightly, even though there was no probable cause for arrest and the plaintiff was following the deputy's instructions). Plaintiff alleges he did not actively resist arrest or attempt to flee, which diminishes any justification for using handcuffs. Baldwin v. Placer County, 418 F.3d 966, 970 (9th Cir. 2005) (stating that the governmental interests in using handcuffs were at a minimum when there was no indication that officers believed the suspects would flee or be armed). As such, the Court concludes that based on the allegations, "the need for the force, if any, was minimal at best." Erath, 342 F.3d at 1061. Under these circumstances, the TAC plausibly alleges that officers McKenrick, Rector, Newbold, and Colmenero acted objectively unreasonably and violated the Fourth Amendment when they physically restrained him without probable cause, battered and assaulted him over the course of

several hours, bent him down on a table, pushed his head against the table, and then broke his harm when they handcuffed him. The TAC also sufficiently alleges each defendant's personal participation since Plaintiff alleges that all of these officers either engaged in or were physically present during the alleged misconduct.[3] As such, Plaintiff adequately alleges his excessive force claim against each Individual Federal Defendant in their individual capacities. The Court, therefore, DENIES Defendants' Motion to Dismiss Plaintiff's Second Cause of Action.

### 3. Third Cause of Action: Intentional Discrimination in Violation of the Equal Protection Clause of the Fifth Amendment

Defendants argue that absent from the TAC are allegations demonstrating that any one of the individual defendants—McKenrick, Rector or Colmenero—purposefully discriminated against Plaintiff on account of his Egyptian ethnicity, race or national origin. (Mot. at 17.) In arguing that Plaintiff's Third Cause of Action should be dismissed, Defendants point out that there are no allegations that any one of the CBPOs "knew of Plaintiff's Egyptian ethnicity, race, or national origin." (Id. at 18.) In so doing, Defendants assert that the TSA's receipt of Plaintiff's passport at the airport security checkpoint does not allege the CBPOs' knowledge of the facts contained therein. (Id.) Relatedly, Defendants maintain that the allegation that the CBPOs referred to Plaintiff as a "bad man" is insufficient to state a Fifth Amendment claim. (Reply at 6.) In addition, Defendants argue that the TAC fails to dispel the "perfectly logical explanation" for Officer Flores's request to see Plaintiff's passport—"Plaintiff was traveling with two passports that reflected different names, and that he had previously been stopped because his passport did not match his boarding pass." (Reply at 6.)

To state an equal protection violation under the Fifth Amendment, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." Iqbal, 556 U.S. at 676. "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences." Id. (internal quotation marks omitted). "It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." Id. at 676–77, 129 S.Ct. 1937 (alteration in original) (internal quotation marks omitted).

Construing the allegations as true, purposeful discrimination is a plausible conclusion. Plaintiff alleges he was singled out and called a "bad man" by either McKenrick, Rector or Newbold. Plaintiff was allegedly detained and searched while the other passengers were free to board. As discussed above, the allegations are sufficient to plausibly infer Defendants lacked the

---

[3] While in the context of Bivens claims, "individual government officials cannot be held liable . . . unless they themselves acted unconstitutionally," Wood v. Moss, 134 S. Ct. 2056, 2070 (2014) (quoting Iqbal, 556 U.S. at 683)(internal quotation marks omitted), officers can be held liable for failing to intercede "when their fellow officers violate the constitutional rights of a suspect or other citizen" if they had an opportunity to do so. Perez v. United States, 103 F. Supp. 3d 1180, 1212 (9th Cir. 2015) (citing United States v. Koon, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994)); Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 200).

authority to detain Plaintiff.  Presumably, the only information Defendants had about Plaintiff was his appearance and the information on his boarding pass or passport.  Cf. Chavez v. United States, 683 F.3d 1102, 1112 (9th Cir. 2012) ("The facts alleged in the complaint do not indicate that, when Hunt made these two stops, any observable characteristics other than race could have provided a basis for reasonable suspicion.").  Plaintiff also alleges Defendants falsely accused him of attempting to strike CBPO Flores "despite making no verbal or non-verbal indication that he intended to do so."  (TAC ¶ 22.)  Instead of simply requesting to inspect Plaintiff's two passports or briefly stopping him to ask him questions, McKenrick, Rector, Newbold and Colmenero allegedly grabbed him, searched him, then subjected him to an unlawful arrest followed by an aggressive interrogation that lasted several hours.  Defendants' "perfectly logical explanation,"—that Plaintiff was traveling with two passports"—fails to dispel the inference of purposeful discrimination because despite Plaintiff's denials of any wrongdoing and the repeated failure to uncover any evidence of contraband, Defendants persisted in their invasive detention.  In the absence of any other legitimate motive, the TAC alleges enough factual content to infer intentional discrimination based on Plaintiff's race or national origin.

   The Court can also reasonably infer from the TAC each Individual Federal Defendant's personal participation in violating Plaintiff's constitutional rights or playing a supervisory or causal role in the constitutional harms he allegedly suffered.  By allegedly singling Plaintiff because of his race or national origin, CBPO Flores plausibly discriminated against him and then set in motion the constitutional transgressions of the other customs officers involved.  McKenrick, as supervisor, is liable for the constitutional torts of those over which he has authority if he has knowledge of his employees' misconduct.  As such, McKenrick's liability is sufficiently alleged not only for his alleged direct involvement, but also because he was present during the constitutional violations allegedly committed by Flores, McKenrick, Rector and Newbold.  Rector, Newbold and Colmenero are alleged to have physically restrained Plaintiff and then either physically assaulted him or yelled at him.  Each of the Defendant's affirmative acts given the absence of any alternative explanation apart from a discriminatory purpose "nudg[e] his claim of purposeful discrimination across the line from conceivable to plausible." Iqbal, 556 U.S. at 683. (internal quotation marks omitted).  The Court therefore concludes Plaintiff adequately alleges invidious discrimination to state an equal protection claim under the Fifth Amendment.  Accordingly, the Court DENIES Defendants' Motion to Dismiss Plaintiff's Third Cause of Action.

**B. Implying a <u>Bivens</u> Cause of Action**

   Defendants argue that there is no Bivens remedy for Plaintiff's First, Second, and Third Causes of Action, and the Court should abstain from implying one in this case. (Mot. at 21.)  To this end, Defendants argue that there are adequate alternative remedies to redress Plaintiff's grievances, including the Federal Tort Claims Act, the CBPOs' regime for responding to customer complaints, and the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"), among others. (Mot. at 18-19.)  In addition, Defendants maintain that recognition of a Bivens remedy in these circumstances "would open the flood gates of litigation for every airplane passenger delayed at a port of entry," which "could cause CBP officers to

ignore their duties to enforce customs regulations for fear that their choice of person to inquire of, their tone, gestures, or mannerisms, could subject them to personal monetary liability." (Id. at 20.)

Bivens proceeded on the theory that a right suggests a remedy. Bivens creates "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." Correctional Services Corp. v. Malesko, 534 U.S. 61, 66 (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend Bivens liability "to any new context or new category of defendants." 534 U.S., at 68; see also Wilkie, 551 U.S., at 549–550. The Supreme Court has implied a Bivens right of action "to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment," see Davis v. Passman, 442 U.S. 228 (1979). At this time, the Court sees no need to distinguish the circumstances alleged here from the circumstances in Bivens and Passman where damages remedies were recognized for Fourth Amendment unreasonable search and seizure claims and Fifth Amendment equal protection claims premised on intentional discrimination.

**C. Qualified Immunity**

Defendants assert they are entitled to qualified immunity, mandating dismissal of Plaintiff's claims. Qualified immunity shields government officials from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine is intended "to mitigate the social costs of exposing government officials to personal liability," Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998), by giving officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). Properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). To overcome the defense of qualified immunity here, Plaintiff must allege facts showing that the conduct of each individual federal defendant (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Al–Kidd, 563 U.S. at 735. The Court need not undertake its inquiry in that order. Pearson, 555 U.S. at 236.

To determine whether a right was clearly established, a district court in this Circuit turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act." Cmty. House, Inc. v. City of Boise, 623 F.3d 945, 967 (9th Cir. 2010). "The Fourth Amendment right against unreasonable seizure is clearly established." Moore v. Gerstein, 107 F.3d 16 (9th Cir. 1996). Specifically, assaulting a restrained detainee was clearly established as a constitutional violation at the time the conduct occurred. Cf. Palmer v. Sanderson, 9 F.3d 1433 (9th Cir. 1993) (holding that Deputy sheriff was not entitled to qualified immunity where deputy sheriff handcuffed arrestee so tightly as to cause pain and bruises and refused to loosen handcuffs after arrestee complained of pain, since Fourth Amendment right to be free from use of excessive force during arrest was clearly established at time of plaintiff's arrest); Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989)(holding that unreasonably injuring a person's wrists while applying handcuffs

constitutes use of excessive force under Fourth Amendment). The right to not to be arrested without probable cause is also clearly established. See, e.g., Liberal v. Estrada, 632 F.3d 1064 (9th Cir. 2011) (finding that an objectively reasonable officer responding would know that a 45-minute detention without probable cause, during which the officers were not diligently pursuing their investigation was an unlawful detention of unreasonable duration in violation of clearly established Fourth Amendment law).

Because the TAC states an equal protection claim, Defendants are not entitled to qualified immunity if Plaintiff's right to be free from intentional discrimination is clearly established. The constitutional right to be free from such invidious discrimination is so well established and so "essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." Flores v. Pierce, 617 F.2d 1386, 1392 (9th Cir. 1980); see Lindsey v. Shalmy, 29 F.3d 1382, 1386 (9th Cir. 1994) ("Well prior to 1988 the protection afforded under the Equal Protection Clause was held to proscribe *any* purposeful discrimination by state actors, be it in the workplace or elsewhere, directed at an individual solely because of the individual's membership in a protected class." ) (citing Washington v. Davis, 426 U.S. 229, 239 (1976); Yick Wo v. Hopkins, 118 U.S. 356 (1886) (holding that the Clause prohibits discriminatory application of neutral statutes).

Still, Defendants assert they are entitled to qualified immunity because the statutory law and existing case law protected their actions. Defendants cite 32 U.S.C. section 5317(b),[4] Duncan, 693 F.2d at 977, United States v. Ezeiruaku, 936 F.2d 136, 139-40 (3d Cir. 1991) in support of their authority to search and detain Plaintiff and his luggage at the airport. (Mot. at 23.) To argue they had the authority to use reasonable force while handcuffing Plaintiff, they refer to Muehler v. Mena, 544 U.S. at 99. (Id.) The authority Defendants cite is inapplicable to the circumstances alleged. In Duncan, the customs agents had probable cause to arrest the individual because he stated he concealed currency over the maximum exportable amount and the agents found evidence of that currency after an initial minimally invasive pat-down search. United States v. Duncan, 693 F.2d 971 (9th Cir. 1982). Even the Third Circuit case cited by Defendants "begin[s] [its] discussion by emphasizing that there is a distinction between a routine and non-routine search at a border," stating that while "[a]n incoming routine search at the border needs no articulable suspicion to justify it[,] a non-routine search triggers the requirement of reasonable suspicion." Ezeiruaku, 936 F.2d at 140.

Defendants seem to employ a selective reading of Muehler v. Mena as well. In Mena, the Court held that "[i]nherent in [*Michigan v.*] *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Muehler v. Mena, 544 U.S. 93, 98–99 (2005). The Court's approval of the officers' detention of an individual in Mena relied on the fact that the officers had obtained a warrant to search a home the plaintiff occupied. Id. at 98 ("Thus, Mena's detention for the duration of the search was

---

[4] Defendants fail to explain why a provision titled "Search and forfeiture of monetary instruments" would be applicable here. 31 U.S.C.A. § 5317.

reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search."); see also Michigan v. Summers, 452 U.S. 692, 701 (1981)("Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband."). Accordingly, the doctrine of qualified immunity does not provide a basis to dismiss any of Plaintiff's claims.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss. (Dkt. No. 72.)

**IT IS SO ORDERED.**